REVISED AUGUST 4, 2009

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

**United States Court of Appeals**
**Fifth Circuit**

**F I L E D**

July 31, 2009

Charles R. Fulbruge III
Clerk

No. 08-60750

UNITED STATES OF AMERICA

Plaintiff-Appellee

v.

STEVE MICHAEL FASANO

Defendant-Appellant

Appeal from the United States District Court
for the Southern District of Mississippi

Before HIGGINBOTHAM, SMITH, and SOUTHWICK, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

In the early afternoon of May 14, 2002 a lone robber entered the Citizens State Bank in Morton, Mississippi, handed the teller a note that said "Robbery. All 100s," and departed with $6600. He wore a white hard hat, a work shirt and black sunglasses which he discarded near the bank where they were recovered by police within minutes of the robbery. Responding to the sobering impact of DNA upon criminal prosecutions, Congress passed the Innocence Protection Act of 2004.[1] The following year, a Mississippi jury found that Fasano robbed the

---

[1] 18 USC § 3600.

bank, resulting in a conviction affirmed by this court.[2] In affirming Fasano's conviction we found that the jury's verdict was supported by substantial evidence, observing:

> The following record evidence points to Fasono's guilt: (1) bank video camera footage showed a man with Fasono's build robbing the bank; (2) four eyewitnesses identified Fasono as the robber; (3) vehicle records revealed that Fasono's vehicle and another vehicle he had access to matched eyewitness descriptions of the robber's vehicle; and (4) Fasono's fingerprints were found on the demand note used in the robbery. Additionally, although motive is not an element required for conviction . . . the Government established that Fasono lost approximately $1,800 gambling a few hours prior to the robbery. A thorough review of the record and our strict standard of review require us to reject Fasono's sufficiency of the evidence argument.[3]

Today he appeals from the district court's refusal to order DNA testing of the shirt, hard hat and sunglasses under the Innocence Protection Act. We disagree with our able brother, persuaded that DNA testing should be ordered. We vacate and remand with instruction to order the testing.

I

To secure court ordered testing of DNA an applicant must satisfy each of the ten prerequisites enumerated in the statute.[4] Only two of the requirements

---

[2] United States v. Fasono, 217 F. App'x 373 (5th Cir. Feb. 13, 2007). This alternative spelling of Fasano's name appears in previous opinions and throughout the record.

[3] Id. at 374–75.

[4] 18 U.S.C. § 3600(a) states in relevant part:
(1) The applicant asserts, under penalty of perjury, that the applicant is actually innocent of—
    (A) the Federal offense for which the applicant is under a sentence of

of the statute are contested. Fasano urges that the district court erred in findings that he failed to meet the chain of custody requirements of 18 U.S.C. § 3600(a)(4) and to establish that DNA testing would produce a "reasonable probability" that he did not commit the robbery, as required by § 3600 (a)(8). We see the readings by the district court of Sections (a)(4) and (a) (8) as questions

---

imprisonment or death; or

. . .

(2) The specific evidence to be tested was secured in relation to the investigation or prosecution of the Federal or State offense referenced in the applicant's assertion under paragraph (1).

(3) The specific evidence to be tested—

(A) was not previously subjected to DNA testing and the applicant did not—

(i) knowingly and voluntarily waive the right to request DNA testing of that evidence in a court proceeding after the date of enactment of the Innocence Protection Act of 2004; or

(ii) knowingly fail to request DNA testing of that evidence in a prior motion for postconviction DNA testing; or

(B) was previously subjected to DNA testing and the applicant is requesting DNA testing using a new method or technology that is substantially more probative than the prior DNA testing.

(4) The specific evidence to be tested is in the possession of the Government and has been subject to a chain of custody and retained under conditions sufficient to ensure that such evidence has not been substituted, contaminated, tampered with, replaced, or altered in any respect material to the proposed DNA testing.

(5) The proposed DNA testing is reasonable in scope, uses scientifically sound methods, and is consistent with accepted forensic practices.

(6) The applicant identifies a theory of defense that—

(A) is not inconsistent with an affirmative defense presented at trial; and

(B) would establish the actual innocence of the applicant of the Federal or State offense references in the applicant's assertion under paragraph (1).

(7) If the applicant was convicted following a trial, the identity of the perpetrator was at issue in the trial.

(8) The proposed DNA testing of the specific evidence may produce new material evidence that would—

(A) support the theory of defense references in paragraph (6); and

(B) raise a reasonable probability that the applicant did not commit the offense.

(9) The applicant certifies that the applicant will provide a DNA sample for purposes of comparison.

(10) The motion is made in a timely fashion . . . .

3

of law and we review them de novo. Of course its underlying fact findings are reviewed only for clear error.

II

-1-

Section (a)(4) requires demonstration that"[t]he specific evidence to be tested is in the possession of the Government and has been subject to a chain of custody and retained under conditions sufficient to ensure that such evidence has not been substituted, contaminated, tampered with, replaced, or altered in any respect material to the proposed DNA testing." This has two components. First there is the requirement of chain of custody. Second there is the requirement that there has been no alteration of evidence material to DNA testing. The district court read these elements together to conclude that the chain of custody in a proceeding under (a)(4) is narrower than that demanded for the admission of evidence at trial. Fasano urges that the trial standard for admission into evidence is the measure and has been met; that he need only show that the result of testing would be admitted under FED. R. EVID. 901. And that hurdle is cleared by demonstration that the evidence was continuously in the possession of one or more of the parties and the circumstances of any transfers.[5] We do not read the statute to impose a more exacting standard for

---

[5] See U.S. v. Guidry, 406 F.3d 314, 320-21 (5th Cir. 2005); U.S. v. Johnson, 68 F.3d 899, 903 (5th Cir. 1995); U.S. v. Bermea, 30 F.3d 1539, 1574 (5th Cir. 1994); Ballou v. Henri Studios, Inc., 656 F.2d 1147, 1155 (5th Cir. 1981) (requiring a "threshold showing that reasonable precautions were taken against the risk of alteration, contamination or adulteration. The proponent of the evidence need not rule out every conceivable chance that somehow the identity or character of the evidence underwent change . . . . So long as the court is persuaded that as a matter of normal likelihood the evidence has been adequately safeguarded, the jury should be permitted to consider and assess it in light of the surrounding

a showing of the chain of custody in a proceeding under the Innocence Act than would be demanded in a trial itself. Indeed there is argument with some purchase, that the trial standard is itself too exacting for an inquiry into whether tests should be ordered. This is because much of the uncertainty inherent in this predictive exercise can be dispelled only by the tests a petitioner is seeking. Looking through the text and structure of the statute, we see the question posed by (a)(4) in such proceedings to be whether testing offers a reasonable possibility of securing sound DNA results from material for which the usual trial demands for chain of custody can be met. This may or may not in a given case prove to make precisely the same demand for authentication as that of admissibility at trial. And of course there may be overlap in the two demands of (a)(4), when for example a break in the chain of custody presents an insurmountable risk of spoilation—alteration material to DNA testing.

We are not persuaded that there was a break in the chain or that the record can support a finding of the forbidden spoilation. The Morton police took custody of the physical evidence including the shirt, hard hat and glasses within minutes of the robbery. Custody then moved from the Morton police to the FBI. The FBI gave a receipt for the physical evidence three days later, on May 19, 2002. The government gave access to Defendant's expert in finger prints in early 2005 but contrary to the assumption of the district court there is no evidence that the items ever left the custody of the FBI or federal prosecutors. The defendant asserts that this did not happen. And, although we are not so confident, as best we can discern from the record that is so. Regardless, ultimately the question is one of authentication.

---

circumstances.") (internal quotations omitted).

It is no surprise that questions of the adequacy of a showing of the chain of custody of proffered evidence arise most with fungible items, or items whose identity can be changed by adulteration. There is little or no question but that the clothing and glasses were items worn by the robber. The focus then is on adulteration.

After trial and before sentencing defense counsel obtained permission to reenact the robbery with use of the physical evidence including the shirt, hard hat and glasses but the items could not be located. The district court refused to grant a motion for new trial resting on this inability of the government to locate this evidence. Some time later the government found a paper bag with all the physical evidence in a closet next to the office of the government prosecutor in the case, who had in the meanwhile retired from service.[6] Government had this evidence in its possession within hours of the robbery and it remained there. That it lay quiet in a paper bag in a court house closet may suggest an unwarranted casualness but that it was unseen, forgotten, and untouched is of no moment here. At least there is no evidence one way or the other whether this is so and we cannot place upon the defendant the burden of proving its history while it is held in government custody. To do so would create an entrance gate so difficult to enter as to frustrate the core objective of the statute.

-2-

The district court found "there is no indication that any measurers [sic] were taken to either preserve the DNA that might be present on those items, or

---

[6] The district court found that the paper bag was found in the Mississippi Attorney General's office. This discrepancy is unexplained. The government's brief on this appeal asserts that it was found in a closet that apparently served former AUSA Bond.

to protect those items from possible DNA contamination." It insisted that every government agent who handled the DNA be identified to assure that they "would provide DNA samples in order to isolate them as potential sources of DNA contamination." While the expert testimony, which came to the court in affidavits, informed that the time resting in the paper bag would not cause significant degradation of any DNA, it remains the case that others handing the evidence might have left their DNA. While relevant under (a)(8), concerns over the possible presence of the DNA of multiple handlers of the evidence are also relevant to questions of spoilation of DNA under (a)(4). Expert Gina M. Pineda, on whose testimony the district court relied in its worry over the need to exclude the DNA of others unknown made the relevant observation, which the district court stepped past, that "DNA mixtures in which each component is present at high enough quantity and quality for detection have no bearing on the ability to exclude a person's DNA from the profiles present in the mixture." She further observed: "In my experience, mixtures have made interpretation impossible in only a narrow set of cases." We are persuaded that the relevant tests can be performed in compliance with the limits of (a)(4), leaving other consequences of the possibility of multiple donors of DNA to (a)(8), where it is apt. Any implicit contrary finding by the district court is clearly erroneous.

III

Fasano argues that the district court imposed a burden higher than (a)(8) of the statute requires. That section requires an applicant for post-conviction DNA testing to demonstrate that:

> The proposed DNA testing of the specific evidence may produce new material evidence that would—

> (A) support the theory of defense referenced in paragraph (6)[regarding the affirmative defense presented at trial]; and
> (B) raise a reasonable probability that the applicant did not commit the offense.

Fasano's defense at trial attacked the reliability of the eyewitness testimony and pointed the finger at Mark Westly Hughes. Hughes had a criminal record and had been staying in his old room as a guest of Fasano's brother. The defense argued that Hughes had access to the green shirt, hard hat and glasses; that although Fasano's finger prints were on the demand note, the paper on which the demand note was written came from his old room. The state of course put the clothes on Fasano with the eyewitness testimony and Fasano would put them on Hughes. That the robber wore them and presented the note was never at issue.

The question here is whether testing may produce new material evidence that would raise a reasonable probability that the applicant did not commit the offense. The district court thought not, based on the fingerprints on the demand note and the eyewitness testimony. There is no question but that the conviction is well supported by evidence as we concluded in affirming Fasano's conviction. If however testing does not find Fasano's DNA on the clothing and glasses but finds the DNA of Hughes the strong case evaporates; here the strength of the evidence by no means makes fanciful a conclusion that there is a reasonable probability that Fasano was not the robber. That is, unless we are to refuse to accept the weakness of eyewitness testimony, a reality that DNA testing has forced upon the legal community. There are myriad possibilities of outcomes from testing. We need not puzzle over their range. Nor do we now address the power of the results of testing. These are fact specific cases and Fasano has

brought himself within the reach of the Innocence Protection Act and the tests must be ordered.

VACATED and REMANDED.